UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :

UNITED STATES OF AMERICA        :

                                :       23-CR-0209-VEC

              -v-               :

                                :

MATEO CABRERA              :

                                :

                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## **<u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS EVIDENCE</u>**

## **TABLE OF CONTENTS**

Table of Authorities………...……………………………………………..……..3

I.     Preliminary Statement…………………………………………....………..6

II.    Statement of Relevant Facts………………………………………..……..7

III.   Argument………………………………………………………..……..10

    a. Mr. Cabrera's Fourth Amendment rights were violated when officers entered his home without a warrant and absent consent and thus the firearm and ammunition discovered inside must be suppressed…………………10

       i.     There was no basis to enter Mr. Cabrera's home…………….……11

       ii.    Even if the initial entry into Mr. Cabrera's apartment occurred under "lawful process," there was no basis for officers to conduct a protective sweep…………………………………………...……..14

       iii.   The protective sweep doctrine did not give law enforcement authority to search Mr. Cabrera's nightstand drawer and Mr. Cabrera's statement that there was a gun in the drawer did not constitute consent to search that drawer…………………..………16

       iv.   Because of the unlawful entry and search of Mr. Cabrera's home, the gun and ammunition discovered in Mr. Cabrera's nightstand, as well as the evidence obtained from Mr. Aguilar, must be suppressed as fruit of the poisonous tree………………………………...………19

    b. The evidence found on the cellphone seized from Mr. Cabrera's bathroom must be suppressed because officers lacked lawful authority to enter and search Mr. Cabrera's home and the subsequent warrant for the cellphone was predicated on tainted evidence………………………………...………22

i.  The Discovery and Seizure of Mr. Cabrera's Cellphone was the Product of the Initial Unlawful Entry and Search of his Apartment………………………………………..……………22

ii.  Mr. Cabrera did not Give Officers Voluntary Consent to Search his Apartment…………………………………………………..……..23

iii.  The Warrant to Seize and Search Mr. Cabrera's Cellphone was based on Tainted Evidence…………………………….…………24

IV.  Conclusion…………………………………………………………………..26

# TABLE OF AUTHORITIES

*Brigham City, Utah v. Stuart*,
  547 U.S. 398 (2006)……………………………………………………….……..10

*Kentucky v. King*,
  563 U.S. 452 (2011)……………………………………………………...………..11, 12

*Maryland v. Buie*,
  494 U.S. 325 (1990)……………………………………………………….………14, 16

*Payton v. New York*,
  445 U.S. 573 (1980)……………………………………………………...……6, 10

*Schneckloth v. Bustamonte*,
  412 U.S. 218 (1973)……………………………………………………...…………….17

*United States v. Allen*,
  813 F.3d 76 (2d Cir. 2016)……………………………………………………….………15

*United States v. Buettner-Janusch*,
  646 F.2d 759 (2d Cir. 1981)……………………………………………….……..16

*United States v. Gandia*,
  424 F.3d 255 (2d Cir. 2005)……………………………………………….………14

*United States v. Gordon*,
  346 F. Supp. 3d 999 (E.D. Mich. 2018)……………………………………….……..20, 21

*United States v. Hassock*,
  631  F.3d 79 (2d Cir. 2011)……………………………………………...…………….13

*United States v. Isiofia*,
  2003 WL 21018853 (S.D.N.Y. May 5, 2003)………………………..12, 13, 17, 18, 19, 23

*United States v. Isiofia*,
  370 F.3d 226 (2d Cir. 2004)……………………………………………………...12, 19, 24

*United States v. Miller*,
  430 F.3d 93 (2d Cir. 2005)……………………………………………….……11

*United States v. Morgan Vargas*,
  376 F.3d 112 (2d Cir. 2004)……………………………………………….……..14, 15, 16

*United States v. Olivares-Rangel*,

    458 F.3d 1104 (10th Cir. 2006)…………………………………………….……………20

*United States v. Reilly*,

    76 F.3d 1271 (2d Cir. 1996)…………………………………………………...………24

*United States v. Trzaska*,

    111 F.3d 1019 (2d Cir. 1997)…………………………………………………….………24

*United States v. United States District Court*,

    407 U.S. 297 (1972)…………………………….…………………………………………..10

*United States v. Williams*,

    365 F. Supp. 3d 343 (S.D.N.Y. 2019)…………………………………………...………26

*United States v. Wilson*,

    11 F.3d 346 (2d Cir. 1993)……………………………………………...……...17

*Utah v. Strieff*,

    579 U.S. 232 (2016)…………………………………………………………….……...19, 20

*Wong Sun v. United States*,

    371 U.S. 471 (1963)………………………………………………………...………20, 21, 22

## I. Preliminary Statement

> In none is the [Fourth Amendment's circumscribed] zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their . . . houses . . . shall not be violated."

> – <u>Payton v. New York</u>, 445 U.S. 573, 589 (1980) (quoting U.S. Const. amend. IV).

On April 5, 2023, Mateo Cabrera had an unquestionable right to be protected from the multiple law enforcement agents who invaded his home in the Bronx, New York without a warrant, consent, or any other valid exception to the Fourth Amendment's warrant requirement. It makes no difference that officers found a firearm and ammunition in his bedroom dresser following this unlawful intrusion, as the means do not justify the ends. Such egregious disregard for Mr. Cabrera's constitutional protections must not be endorsed by this Court.

Mr. Cabrera is charged by indictment with one count of being a felon in possession of a firearm, in violation of 18 U.S.C § 922(g)(1), and one count of conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 841(b)(1)(A). Mr. Cabrera respectfully submits this Memorandum of Law in support of his motion for an Order suppressing the evidence seized by law enforcement following a warrantless entry and search of his home, in violation of his Fourth Amendment rights.

## II.    Statement of Relevant Facts

On April 4, 2023, a FedEx employee intercepted a package addressed to "Julissa Cabrera" at an apartment on ███████████ in the Bronx, suspecting that it contained contraband.  Doc. 1, Compl. ¶3a.; Ex. A (Interview of DEA Special Agent Todd Roskosky).  The FedEx employee notified law enforcement that, upon inspection, the package contained a clear plastic jug with an unknown, crystallized substance inside.  Compl. ¶3a.  On April 5, 2023, law enforcement agents field-tested the substance and confirmed the presence of methamphetamine.  Compl. ¶3a, ¶3b.  Agents then replaced the methamphetamine with non-contraband and resealed the package for delivery.  Compl. ¶3b.  That same day, at approximately 11:50 AM, agents went to ███████████████████, Mr. Cabrera's apartment in the Bronx, to deliver the package.  Ex. A.

According to DEA Special Agent Todd Roskosky, an undercover agent went to the apartment door, knocked, and announced that he had a package, while several law enforcement agents remained out of sight in the hallway.  Ex. A.  An individual later identified as Yoel Ramirez Aguilar answered the door.  Ex. A.  The agent stated that he had a package for "Julissa Cabrera" and Mr. Aguilar affirmed in sum and substance, "that's here[.]"  Ex. A.  The agents waiting unseen in the hallway then made their presence known, identified themselves as law enforcement, entered the apartment, and arrested Mr. Aguilar.  Compl. ¶3d; see United States v. Yoel Ramirez

Aguilar, 23-MJ-2799, Doc. 1 (Compl. ¶5e).  Mr. Aguilar was subsequently taken to an NYPD precinct where he provided a statement and gave law enforcement access to his phone.  United States v. Yoel Ramirez Aguilar, 23-MJ-2799, Doc. 1 (Compl. ¶5e).

Interestingly, Agent Roskosky claims that, while outside the front door of Mr. Cabrera's apartment, law enforcement heard the bathroom shower on and saw the bathroom door closed, and that it was these observations that prompted law enforcement to enter the apartment to conduct a protective sweep.  Ex. A.  Agent Roskosky's version of events, however, is contradicted by the layout of Mr. Cabrera's apartment.  See Ex. A.  Indeed, as shown by a video walkthrough of Mr. Cabrera's apartment, the sole bathroom is located at the far rear of the apartment and the bathroom door cannot be seen unless one has already walked through both the foyer and the living room.  See Ex. B (Video Walkthrough of Mateo Cabrera's Apartment).  Hence, a more likely scenario is that officers entered the apartment to arrest Mr. Aguilar and then made these observations once already inside.

Nevertheless, Agent Roskosky attests that upon hearing the shower on and seeing the bathroom door closed, law enforcement inquired about the presence of additional people in the apartment.  Ex. A.  Without waiting for a response, they then entered the apartment.  Ex. A.  After entering the apartment, law enforcement encountered Mr. Cabrera coming out of the bathroom wearing just a towel.  Ex. A.

8

They allowed Mr. Cabrera to get dressed in his bedroom while continuing the protective sweep.  Ex. A.  Agents already inside of Mr. Cabrera's bedroom asked him if there was anything in the room they should know about, to which Mr. Cabrera responded that there was a firearm in the nightstand drawer.  Ex. A.  The agents then collected a firearm and ammunition from Mr. Cabrera's nightstand.  Ex. A.

After collecting the firearm and ammunition, officers requested and obtained Mr. Cabrera's written consent to search the rest of the apartment.  Ex. A.  Pursuant to that search, officers seized Mr. Cabrera's cellphone from the bathroom.  The government did not obtain a warrant to seize and search that cellphone until three weeks later.  Ex. C (Application for Warrant for iPhone).

Ultimately, Mr. Rivera was arrested and charged with being a felon in possession of a firearm.  Four months later, the government filed against him the additional charge of conspiracy to distribute controlled substances.

Mr. Cabrera now moves to suppress the gun and ammunition found in his apartment because officers violated his Fourth Amendment rights by entering and conducting a search of the apartment without a warrant, consent, or any other valid exception to the warrant requirement.  Additionally, Mr. Cabrera moves to suppress Mr. Aguilar's post-arrest statements and any evidence found on Mr. Aguilar's cellphone, as this evidence is fruit of the unlawful entry into Mr. Cabrera's home.

Finally, Mr. Cabrera moves to suppress any evidence found on his own cellphone because: (1) the discovery and seizure of the cellphone was the product of the initial unlawful entry and search of his apartment; (2) he did not give officers voluntary consent to search his apartment; and (3) the subsequent warrant to seize and search his cellphone was obtained based on tainted evidence.

### III.    Argument

      a. <u>Mr. Cabrera's Fourth Amendment rights were violated when officers entered his home without a warrant and absent consent and thus the firearm and ammunition discovered inside must be suppressed.</u>

The Fourth Amendment guarantees the "right of the people to be secure in their … houses … against unreasonable searches and seizures." U.S. Const. amend. IV. This protection covers both the physical entry into an individual's home and any search therein. <u>Payton</u>, 445 U.S. at 585–86 ("physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed") (quoting <u>United States v. United States District Court</u>, 407 U.S. 297, 313 (1972)). The Supreme Court has thus emphasized that "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." <u>Brigham City, Utah v. Stuart</u>, 547 U.S. 398, 403 (2006) (internal quotation marks and citations omitted). That presumption is only

rebuttable where law enforcement can demonstrate the applicability of an exception to the warrant requirement.  <u>Kentucky v. King</u>, 563 U.S. 452, 459 (2011).

### i.     There was no basis to enter Mr. Cabrera's home.

The government will assert that law enforcement had authority to enter and search Mr. Cabrera's home without a warrant pursuant to the protective sweep exception to the warrant requirement.  The Court, however, must flatly reject this argument because the protective sweep doctrine only applies where officers are already lawfully present within an individual's home.  The government will be unable to make such a showing.

The protective sweep doctrine allows officers who are lawfully present in an individual's home to conduct a cursory visual inspection of surrounding areas "when the officer possesses articulable facts which, taken together with rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the . . . scene." <u>United States v. Miller</u>, 430 F.3d 93, 98 (2d Cir. 2005) (internal quotation marks and citation omitted).  The Second Circuit has made clear that a threshold requirement for this protective sweep exception to apply is that the officers must be "lawfully present" in the home.  <u>Id.</u> at 99.  In order to demonstrate lawful presence in a home without a warrant or consent, officers must identify exigent circumstances justifying the entry.  <u>See King</u>, 563 U.S. at 460 ("One well-recognized exception applies when

the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.") (internal quotations and citation omitted).

Here, officers were not present within Mr. Cabrera's home under lawful order or for any other lawful purpose. To the contrary, despite engaging in a pre-planned, undercover operation, officers neglected to apply for a search warrant, arrest warrant, or even an anticipatory arrest warrant ahead of time that would have granted them access to the apartment. See United States v. Isiofia, 370 F.3d 226, 228 (2d Cir. 2004) ("For reasons not apparent on the record, the agents did not apply for a search warrant or an anticipatory arrest warrant, although ample time to do so existed."). Furthermore, there is no evidence that Mr. Cabrera or Mr. Aguilar—the individual who answered the front door—invited officers into the home on a consensual basis. On theses grounds alone, law enforcement violated Mr. Cabrera's Fourth Amendment rights by entering his home without a warrant or consent, thereby requiring the suppression of any evidence found therein. See United States v. Isiofia, 2003 WL 21018853, at *4 (S.D.N.Y. May 5, 2003) ("The agents' conduct violated the Fourth Amendment in at least two respects. Most troubling is that a team of eight or nine agents entered the defendant's apartment [following a controlled delivery] without either the defendant's consent or an arrest or search

warrant and some or all of them encamped in his living room, while the defendant, handcuffed to a table, answered their questions.").

Moreover, Agent Roskosky's claim that officers entered the apartment for purposes of conducting a protective sweep is insufficient justification because no exigent circumstances existed to enter the home in the first place.  Indeed, where officers engage in a pre-planned, controlled delivery, no exigencies exist to justify entry into a home.  See Isiofia, 2003 WL 21018853, at *6 ("[T]he police cannot manufacture the exigent circumstances that form the basis for the protective sweep. Where, as here, the government controlled the timing of the controlled delivery, exigent circumstances arising out of law enforcement actions consistent with that timing are deemed manufactured.") (internal quotations omitted); United States v. Hassock, 631 F.3d 79, 88 (2d Cir. 2011) ("[A] protective sweep is reasonable only to safeguard officers in the pursuit of an otherwise legitimate purpose.  Where no other purpose is being pursued, a sweep is no different from any other search and, therefore, requires a warrant, exigency, or authorized consent, none of which were present here.").  Accordingly, the initial entry into Mr. Cabrera's apartment absent a warrant, consent, or exigent circumstances violated his Fourth Amendment rights and any evidence obtained pursuant to that unlawful entry and subsequent search must be suppressed.

> ii.  **Even if the initial entry into Mr. Cabrera's apartment occurred under "lawful process," there was no basis for officers to conduct a protective sweep.**

When officers seek to conduct a protective sweep, they must be able to demonstrate that they had "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer [to] believ[e] that the area to be swept harbors an individual posing a danger to those on the … scene." Maryland v. Buie, 494 U.S. 325, 334 (1990). These articulable facts must "give rise to an individualized suspicion and cannot rely solely on generalizations that suspects are usually accompanied by dangerous third parties." United States v. Gandia, 424 F.3d 255, 264 (2d Cir. 2005). A "[l]ack of information … [or] '[n]o information' cannot be an articulable basis for a sweep that requires information to justify it in the first place." United States v. Moran Vargas, 376 F.3d 112, 117 (2d Cir. 2004).

Here, agents lacked information to support either a belief in the presence of a dangerous third-party or fear for their safety. As a threshold matter, it should be noted that Agent Roskosky's purported basis for initially entering the apartment and conducting a protective sweep—hearing the shower on and seeing the bathroom door closed—lacks credibility. The video walkthrough of Mr. Cabrera's apartment makes clear that it is not possible to see the bathroom door unless officers had already entered the apartment and walked through both the foyer and living room.

14

See Ex. B.   And given the distance from the bathroom to the front door of the apartment, it is equally unlikely that officers could have heard a running shower behind a closed bathroom door from outside of the apartment.   It is therefore more probable that officers had already entered Mr. Cabrera's home illegally to arrest Mr. Aguilar when they made these observations.  United States v. Allen, 813 F.3d 76, 82 (2d Cir. 2016) ("[W]e conclude that where law enforcement officers have summoned a suspect to the door of his home, and he remains inside the home's confines, they may not effect a warrantless 'across the threshold' arrest in the absence of exigent circumstances.").

Setting this aside, even assuming Agent Roskosky's claim gave officers some limited basis to enter the apartment for a protective sweep—which it did not—the need for a further protective sweep ended once they encountered Mr. Cabrera coming out of the bathroom unarmed and wearing only a towel.  Why?  Because the officers have not provided any articulable facts to warrant the belief that there were other "dangerous persons" in the apartment, such that they would have been authorized to continue the protective sweep.  Absent such articulable facts, this Court must find that officers were not authorized to conduct a protective sweep of Mr. Cabrera's apartment, and specifically, within his bedroom.  See Moran Vargas, 376 F.3d at 116 ("The government contends that the agents had a reasonable belief that other people might be in the motel room due to their suspicion that Moran was a

drug courier, their experience that drug couriers often meet up with their contacts, and their awareness that drug traffickers are frequently armed and dangerous. Although the district court and magistrate agreed with this argument, we find that such generalizations, without more, are insufficient to justify a protective sweep."). Consequently, the firearm and ammunition found in Mr. Cabrera's bedroom must be suppressed.

### iii.   The protective sweep doctrine did not give law enforcement authority to search Mr. Cabrera's nightstand drawer and Mr. Cabrera's statement that there was a gun in the drawer did not constitute consent to search that drawer.

The Supreme Court has made plain that protective sweeps must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." See Buie, 494 U.S. at 327.  A nightstand drawer in Mr. Cabrera's bedroom clearly does not fit within that purview.  Hence, the Court must suppress the firearm and ammunition found in the drawer on this additional basis, as officers lacked authority to search the drawer.

To the extent the government argues that officers searched the nightstand drawer pursuant to Mr. Cabrera's voluntary consent, this argument must similarly fail.  It is true that consent may be express or implied from "an individual's words, gestures, or conduct."  See United States v. Buettner-Janusch, 646 F.2d 759, 764 (2d Cir. 1981).  However, courts must examine the totality of the circumstances to

determine whether the consent was "a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." United States v. Wilson, 11 F.3d 346, 351 (2d Cir. 1993) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)).

Here, Mr. Cabrera did not give voluntary written or oral consent before law enforcement agents searched his nightstand drawer. To begin, law enforcement never directly asked Mr. Cabrera for permission to search his nightstand drawer. Instead, they asked whether there was anything in his room they should know about, to which Mr. Cabrera responded that he had a firearm in his nightstand drawer. Ex. A. But merely identifying the presence of a firearm does not equate to express consent to search a private area for that gun.

Additionally, the totality of the circumstances fails to support a finding that Mr. Cabrera granted the agents voluntary, explicit or implicit consent to search his nightstand drawer. First, the short time that lapsed between when Mr. Cabrera was detained by law enforcement under startling circumstances, and when he identified the location of the gun, undoubtedly cuts against voluntariness. Indeed, only minutes before telling officers that there was a firearm in his nightstand drawer, Mr. Cabrera had exited his bathroom in only a towel, and unexpectedly found several armed agents in his living room. See Isiofia, 2003 WL 21018853, at *8 ("The second factor relevant to voluntariness is the time that elapsed between the defendant's

arrest and his consent.  According to the government witnesses, the defendant's consent to open and search his briefcase was given several minutes after the initial entry.  Although the defendant had not been detained long, it was close in time to what must have been a very startling, to say nothing of harrowing, series of events.").

Second, there is no evidence that the agents apprised Mr. Cabrera of the purpose of their presence, what authority they had to search his bedroom, or that he could refuse to provide "consent" to search his nightstand drawer.  See id. at *9 ("A third relevant factor for coerciveness is that there is no indication that he was ever apprised of what crime he was being charged with or what evidence the government hoped to seize; nor was he informed that he had the right to refuse consent.").  That Mr. Cabrera responded to a direct question from officers already searching his apartment while he was in a vulnerable state should surprise no one.  Considering that officers were already in the process of searching the apartment, it would have been a foregone conclusion in Mr. Cabrera's mind that officers were going to discover the firearm regardless of his answer.

A final factor weighing heavily against voluntariness is the fact that officers entered Mr. Cabrera's home unlawfully without a warrant, consent, or exigent circumstances.  See id. ("Finally and perhaps most importantly, although the government agents were either unaware or untroubled by the methods used here, they should have known that their entry and search of the defendant's apartment was

illegal.  An unconstitutional entry and search weighs heavily in the calculus of the objective reasonableness of the defendant's consent.").   Under nearly identical factual circumstances, the Second Circuit, in <u>Isiofia</u>, affirmed the district court's finding that the defendant's consent to search items in his home was involuntary. <u>See</u> 370 F.3d at 231-34 (affirming the district court's finding that defendant's consent was involuntary, in part, because defendant's consent was elicited closely in time to the officers' "startling" initial entry into his home; because consent was obtained while the defendant was handcuffed and surrounded by eight agents; because officers never informed the defendant of the crime he was being charged with or that he had a right to refuse consent; and because officers were unlawfully present within the defendant's home at the time they solicited his consent). Accordingly, like in <u>Isiofia</u>, the Court should find that officers violated Mr. Cabrera's Fourth Amendment rights and suppress the firearm and ammunition found in his nightstand drawer.

> **iv.   Because of the unlawful entry and search of Mr. Cabrera's home, the gun and ammunition discovered in Mr. Cabrera's nightstand, as well as the evidence obtained from Mr. Aguilar, must be suppressed as fruit of the poisonous tree.**

If evidence is derived from information that was illegally obtained, that piece of evidence is inadmissible under the "fruit of the poisonous tree" doctrine.  <u>See</u> <u>Utah v. Strieff</u>, 579 U.S. 232, 237 (2016) ("[T]he exclusionary rule encompasses

both the primary evidence obtained as a direct result of an illegal search or seizure and, relevant here, evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree.") (internal quotations and citation omitted); Wong Sun v. United States, 371 U.S. 471, 487–88 (1963) ("Evidence obtained by exploitation of a primary illegality is regularly excluded under traditional taint analysis as the 'fruit of the poisonous tree.'").  "A defendant does not only have standing under this doctrine in relation to h[is] own property, but also in relation to property or information from third parties that was obtained as a result of illegality by police."  United States v. Gordon, 346 F. Supp. 3d 999, 1006-07 (E.D. Mich. 2018); see United States v. Olivares-Rangel, 458 F.3d 1104, 1117 (10th Cir. 2006) ("While the fruit of the poisonous tree doctrine applies only when the defendant has standing regarding the Fourth Amendment *violation* which constitutes the poisonous tree, the law imposes no separate standing requirement regarding the *evidence* which constitutes the fruit of that poisonous tree.").

Here, but for law enforcement's illegal entry and search of Mr. Cabrera's apartment, law enforcement would not have discovered the gun and ammunition charged in this case.  Because this evidence is the direct product of a tainted entry and search of Mr. Cabrera's apartment, the evidence must be suppressed as fruit of the poisonous tree.

Similarly, but for law enforcement's illegal entry into Mr. Cabrera's home to conduct Mr. Aguilar's warrantless arrest, law enforcement would not have obtained a post-arrest statement from Mr. Aguilar, seized his cellphone upon his arrest, or been able to search his cellphone at the precinct.   Because evidence from Mr. Aguilar's post-arrest statement and his cellphone is the direct product of the tainted entry into Mr. Cabrera's apartment, this evidence must be suppressed as fruit of the poisonous tree.   See Wong Sun, 371 U.S. at 487-88 ("[V]erbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion."); Gordon, 346 F. Supp. 3d at 1007-08 ([V]ictim's cell phone was taken from her *during* the hotel search. . . . No extensive analysis is necessary to determine that, as primary evidence seized during an illegal search, this phone is properly excluded[.] . . . This evidence was excluded [] because the officers here took purposeful and independent actions: they deliberately chose to enter Defendant's private hotel room without a warrant and in a scenario lacking exigent circumstances that would justify a warrantless entry.   The phone was not discovered from an independent source—it was seized during the course of the illegal search.") (internal quotations and citations omitted).

21

b. <u>The evidence found on the cellphone seized from Mr. Cabrera's bathroom must be suppressed because officers lacked lawful authority to enter and search Mr. Cabrera's home and the subsequent warrant for the cellphone was predicated on tainted evidence.</u>

In addition to suppressing the firearm and ammunition found in Mr. Cabrera's home, as well as the evidence from Mr. Aguilar, any evidence found on the cellphone seized from Mr. Cabrera's bathroom must similarly be suppressed for three reasons: (1) the discovery and seizure of the cellphone was the product of the initial unlawful entry and search of Mr. Cabrera's apartment; (2) Mr. Cabrera's did not give officers voluntary consent to search his apartment; and (3) the subsequent warrant to seize and search Mr. Cabrera's cellphone was obtained based on tainted evidence.

i.   **The Discovery and Seizure of Mr. Cabrera's Cellphone was the Product of the Initial Unlawful Entry and Search of his Apartment.**

Because the initial entry and search of Mr. Cabrera's apartment without a warrant or consent was unlawful, the seizure of the cellphone from his bathroom is "fruit of the poisonous tree" and must be suppressed.  <u>See Wong Sun</u>, 371 U.S. at 485 ("The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion.").

### ii.   Mr. Cabrera did not Give Officers Voluntary Consent to Search his Apartment.

To the extent the government argues that the cellphone was seized pursuant to Mr. Cabrera's written consent to search his apartment, this argument must fail because the totality of the circumstances demonstrate that this consent was not given freely or voluntarily.  To be clear, in the minutes preceding the officers obtaining Mr. Cabrera's written consent to search his apartment, multiple armed agents had illegally invaded his home without a warrant; conducted an unlawful protective sweep; detained him in a startling manner while he was coming out of the bathroom wearing just a towel and without informing him of the reason; searched his nightstand drawer without valid consent; and discovered a gun and ammunition that could be used against him in criminal proceedings.  Like the defendant in Isiofia, it is no surprise that, under these coercive pressures, and facing the possibility of being taken to jail, Mr. Cabrera felt compelled to provide officers with consent to search his apartment.  See Isiofia, 2003 WL 21018853, at *8-9 (finding defendant did not provide voluntary consent where officers asked for consent while he was detained following a "startling" event and surrounded by eight agents, where he was not appraised of what crime he was being charged with, and where officers' initial entry into his home was illegal).  Accordingly, just as the Second Circuit found in Isiofia case, Mr. Cabrera's consent was not voluntary, and the cellphone seized pursuant to

the search of his bathroom must be suppressed.   See Isiofia, 370 F.3d at 234 (affirming district court decision).

### iii.   The Warrant to Seize and Search Mr. Cabrera's Cellphone was based on Tainted Evidence.

Finally, the government may argue that the evidence found on Mr. Cabrera's cellphone is admissible because officers later obtained a search and seizure warrant for the phone.  This argument, however, fails because the affidavit in support of that search warrant was predicated on information obtained from the illegal entry and search of Mr. Cabrera's apartment.

The Second Circuit has plainly held that "[e]vidence seized during an illegal search should not be included in a warrant affidavit."  United States v. Trzaska, 111 F.3d 1019, 1026 (2d Cir. 1997).  Although "[t]he mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant . . . [a] reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant."  United States v. Reilly, 76 F.3d 1271, 1282 n.2 (2d Cir. 1996).

Here, the violation of Mr. Cabrera's Fourth Amendment rights occurred the moment officers entered his home without a warrant, consent, or exigent circumstances.  Hence, any evidence obtained thereafter, including evidence from

Mr. Aguilar and the firearm and ammunition found in Mr. Cabrera's bedroom, must be excised from the warrant.  Absent this evidence, the four corners of the warrant affidavit fail miserably to establish probable cause to seize and search Mr. Cabrera's phone.

To be sure, the warrant affidavit states that there was probable cause to believe Mr. Cabrera's cellphone contained evidence of narcotics distribution and firearm possession.  The evidence cited in support of this claim consists of the following:

1. In April 2023, Law enforcement intercepted a FedEx package containing methamphetamine that was scheduled to be delivered to an apartment on ███████████ in the Bronx;

2. Pursuant to a controlled delivery of the package to the Sherman Avenue address, Yoel Aguilar accepted receipt of the package and was subsequently arrested;

3. Yoel Aguilar admitted to officers at the precinct that he understood the package contained narcotics and that he was intending to provide the package to another individual after receiving it.  Further, that he had travelled to the New York City area in order to receive packages on several prior occasions.

4. Yoel Aguiar provided officers with access to his cellphone.  Upon review of the cellphone, there were messages between Aguilar and Mateo Cabrera on Facebook Messenger.  "In one of those messages, which appears to have occurred on April 2, 2023, AGUILAR wrote to Mateo Cabrera, in Spanish, and in sum and substance, that there was an individual in Cali who had been reluctant to send something, but that AGUILAR had convinced that individual to send it by express tomorrow."; and

5. Law enforcement encountered Mateo Cabrera at the ███████████ address.  Mateo Cabrera provided officers with written consent to

search the apartment and officers found a firearm and ammunition in his bedroom nightstand.

See Ex. C at pgs. 4-7.

Notwithstanding the fact that the warrant affidavit intentionally misleads the Court into believing that the firearm and ammunition were discovered subsequent to Mr. Cabrera's written consent to search the apartment, the only evidence offered to link Mr. Cabrera to narcotics distribution and firearm possession was obtained based on the unlawful entry and search of his home.  Indeed, if the Court were to excise the discovery of the firearm and ammunition, and the Facebook messages found on Mr. Aguilar's phone, from the warrant affidavit, there would be no probable cause to link Mr. Cabrera to either of these offenses.  Accordingly, the government's warrant does not cure the unlawful seizure and search of Mr. Cabrera's cellphone, and the evidence found therein must be suppressed.  See United States v. Williams, 365 F. Supp. 3d 343, 350 (S.D.N.Y. 2019) ("The search warrant application here was based almost entirely on the gun and drugs observed during the unlawful protective seep.  Excising the tainted evidence, the warrant plainly was not supported by probable cause.").

## IV.  Conclusion

For each of these reasons, this Court should suppress the firearm and ammunition found in Mr. Cabrera's apartment, Mr. Aguilar's post-arrest statements,

the evidence found on Mr. Aguilar's phone, and the evidence found on Mr. Cabrera's phone as "fruit of the poisonous tree."  To the extent there are factual disputes that must be settled prior to ruling, this Court should hold an evidentiary hearing.

Dated: September 14, 2023

Respectfully Submitted,

*/s/*_____
**Kristoff I. Williams**

Assistant Federal Defender
Federal Defenders of New York
52 Duane Street, 10th Floor
New York, New York 10007
Tel.: (212)-417-8791