USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/20/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
:
UNITED STATES OF AMERICA                :
:
           -against-                         :       23-CR-209 (VEC)
:
:       OPINION AND ORDER
:
MATEO CABRERA,                          :
                             Defendant.    :
:
------------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

      Mateo Cabrera ("Defendant") is charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g), *see* Indictment, Dkt. 5, and conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, *see* Superseding Indictments, Dkts. 17, 44.  He has moved to dismiss the gun count on the grounds that 18 U.S.C. § 922(g) is unconstitutional, *see* Not. of Mot. to Dismiss Indictment, Dkt. 25, and he has moved to suppress evidence seized during a consent search of his apartment, and evidence found during a consent search of his roommate's cellphone on the grounds that the searches were unlawful, *see* Not. of Mot. to Suppress, Dkt. 23.  The Court held an evidentiary hearing on the motion to suppress on December 6, 2023.  Based on the evidence presented and for the reasons discussed below, Defendant's motions are DENIED.

## BACKGROUND

      At the evidentiary hearing, the Court heard testimony from three Government witnesses: Drug Enforcement Administration ("DEA") Special Agent ("SA") Todd Roskosky, New York City Police Department ("NYPD") Detective and Task Force Officer Scott Martin, and DEA SA Jorge DaSilva.

1

On April 4, 2023, FedEx contacted law enforcement about a FedEx parcel (the "Package") addressed to "Julissa Cabrera" at an apartment (the "Apartment") on Sherman Avenue in the Bronx. Compl. ¶ 3(a), Dkt. 1. The Package contained a clear plastic jug containing approximately 1.5 kilograms of an unknown, crystallized substance. *Id*. ¶¶ 3(a)–(b). On April 5, 2023, law enforcement agents field tested the substance; it tested positive for methamphetamine. *Id*. ¶ 3(b). Law enforcement removed the contents, replaced it with a sham substance, and re-sealed the Package. *Id*.

That same day at around noon, an undercover law enforcement officer ("Officer-1") knocked on the door of the Apartment and said he had a package to deliver. *Id*. ¶ 3(c). Several officers were on the stairway leading to the floor on which the Apartment was located with a view of the door to the Apartment. Transcript of December 6, 2023 Suppression Hearing ("Tr.") 7. Yoel Ramirez Aguilar ("Ramirez") answered the door, and Officer-1 said that he had a package for Julissa Cabrera. Compl. ¶ 3(c); Tr. 8. When Ramirez accepted the Package, he was standing in the threshold of the doorway. Tr. 8–9; *see id*. at 43 (SA DaSilva testified that Ramirez was standing in the "doorway area."). At that point, the officers who had been on the stairs rushed to the doorway, and Ramirez was arrested. *Id*. at 8. SA Roskosky, the first to arrive at the Apartment, "passed [Ramirez] back behind [him], and [SA] Jorge DaSilva placed him under arrest." *Id*. at 8–9. SA Roskosky asked Ramirez if anyone else was in the apartment (the Package was address to a female and Ramirez is male). *Id*. at 9. SA Roskosky could not recall if Ramirez answered the question, but while SA Roskosky was standing by the open door into the Apartment, he "could hear a shower on in the bathroom, as well as . . . something with the toilet seat." *Id*. at 9–10. Based on the noises coming from the bathroom, SA Roskosky concluded that there was another individual within the apartment. *Id*. at 10.

Thereafter, the agents announced: "police, make your presence known, come to the door." *Id*. When they received no response, the agents entered the Apartment to conduct a security sweep to see if there were other individuals inside. *Id*. During the agents' protective sweep, Defendant exited the bathroom and was placed under arrest. *Id*. at 14. Defendant was taken into his bedroom so he could get dressed. *Id*. at 34–35. Detective Martin testified that he asked Defendant whether there were "weapons or contraband in the room that could harm or hurt [them]." *Id*. at 61. Defendant stated there was an unloaded firearm in his dresser drawer; Detective Martin testified that Defendant told the officers they "could look around the dresser where he pointed to." *Id*. at 61–62. The officers opened the drawer and saw a nine-millimeter pistol (the "firearm"). *Id*. at 62; Compl. ¶ 3(e). Defendant then signed a consent to search form. Tr. 62–64; Gov. Ex. 1. The officers read Defendant his *Miranda* rights, and Defendant waived his rights in writing. Compl. ¶ 4. Detective Martin testified that Defendant said, "he was willing to comply with [the officers]." Tr. 66.

Defendant was subsequently indicted for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Indictment ¶ 1, Dkt. 5. On August 9, 2023, a superseding indictment was returned adding a charge of conspiracy to distribute a controlled substance, in violation of 21 U.S.C. § 846. Superseding Indictment ¶¶ 1–3, Dkt. 17. On November 8, 2023, a second superseding indictment was returned, amending the timeframe of the charged conspiracy. Superseding Indictment ¶ 1, Dkt. 44.

## DISCUSSION

Defendant filed two pretrial motions: one to dismiss Count Two of the Superseding Indictment on the grounds that Section 922(g) is unconstitutional, and one to suppress any evidence the Government seized from the search of the Apartment (specifically the firearm and

evidence obtained from Defendant's cellphone [1]), as well as Ramirez's post-arrest statements and evidence obtained from Ramirez's cellphone.[2] The Court addresses each in turn.

## I. Defendant's Motion to Dismiss is Denied

Relying on *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), Defendant argues that Section 922(g), the federal statute that prohibits felons from possessing a firearm, violates the Second Amendment to the U.S. Constitution. Def. Mem. in Supp. of Mot. to Dismiss Indictment at 5–6, Dkt. 26. The Government argues that *Bruen* did not disturb Second Circuit precedent upholding the constitutionality of Section 922(g). Gov't Mem. in Opp. to Mot. to Dismiss Indictment at 3–4, Dkt. 31. The Court agrees with the Government that Section 922(g) is constitutional.

### A. Legal Standard

The Supreme Court held in *Bruen* that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 597 U.S. at 17. To justify the regulation of conduct involving guns, the Government must demonstrate that the regulation "is consistent with this Nation's historical tradition of firearm regulation." *Id.* According to the Court, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26. Moreover, if "earlier generations addressed the societal

---

[1] The Government had a search warrant to search the cell phone. Defendant's argument is that the phone was unlawfully seized in the first instance and that, if "tainted evidence" is excluded from the application for the search warrant, it lacked probable cause. Def. Mem. in Supp. of Suppression Mot. at 24–26, Dkt. 24.

[2] Ramirez was arrested on April 5, 2023. He made a statement to the arresting officers and voluntarily gave them access to his cellphone.

problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* at 26–27.

Although the Supreme Court's majority opinion in *Bruen* did not directly address whether that decision would have any impact on felon-in-possession laws, it repeatedly characterized the Supreme Court's Second Amendment jurisprudence as providing "law-abiding" citizens with the right to possess handguns. *See id.* at 9, 26, 29–31, 38, 60, 70. Moreover, the majority stressed that *Bruen* is "consistent" with two relatively recent Supreme Court cases regarding the Second Amendment, *id.* at 10 (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010)), both of which made clear that the Court, although radically altering the landscape vis-à-vis Second Amendment jurisprudence generally, did not see those opinions as disturbing "longstanding" prohibitions on the possession of firearms by felons, *see Heller*, 554 U.S. at 626–27; *McDonald*, 561 U.S. at 786.

Following *Heller* and *McDonald*, the Second Circuit held that Section 922(g) is constitutional. *See United States v. Bogle*, 717 F.3d 281, 281–82 (2d Cir. 2013) (joining "every other circuit to consider the issue" in affirming Section 922(g)'s constitutionality given "longstanding prohibitions on the possession of firearms by felons") (quoting *Heller*, 554 U.S. at 626 and citing *McDonald*, 561 U.S. at 786); *see also United States v. Jimenez*, 895 F.3d 228, 233 (2d Cir. 2018) (citing *Bogle* as precedent "uphold[ing] the federal ban on ex-felons' access to firearms and ammunition").

**B. Application**

*Bruen* does not alter the holding of *Bogle*: Section 922(g) is a constitutional regulation of the possession of firearms. There is nothing in *Bruen* that suggests the Court saw that explication of the reach of the Second Amendment as disturbing the Supreme Court's dicta that

5

"longstanding prohibitions on the possession of firearms by felons" remain constitutional. Six Justices emphasized that very point. *See Bruen*, 597 U.S. at 72 (Alito, J., concurring) (noting that *Bruen* does not "disturb[] anything" the Supreme Court said in *Heller* and *McDonald* regarding "restrictions that may be imposed on the possession or carrying of guns"); *id.* at 80–81 (Kavanaugh, J., and Roberts, C.J., concurring) (same); *id.* at 129–30 (Breyer, Sotomayor, and Kagan, JJ., dissenting) (same).

Because there is nothing in *Bruen* that alters the rationale of *Bogle*, Defendant's motion to dismiss Count Two of the Superseding Indictment is denied.

## II.     Defendant's Motion to Suppress is Denied

Defendant moves to suppress all evidence seized by law enforcement during the search of his Apartment on April 5, 2023, arguing that the warrantless entry and search of his home violated his Fourth Amendment rights. *See generally* Def. Mem. in Supp. of Suppression Mot., Dkt. 24. The motion is denied.

### A.  Law Enforcement's Entry into Defendant's Apartment was Lawful

#### 1.  Legal Standard

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). A "search" occurs for purposes of the Fourth Amendment if law enforcement seeks information by intruding on a person's reasonable expectation of privacy or by means of trespassing upon one's person, house, papers, or effects. *See United States v. Smith*, 967 F.3d 198, 205 (2d Cir. 2020). It is a "basic principle of Fourth Amendment law that searches and

seizures inside a home without a warrant are presumptively unreasonable." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (citation omitted).

The warrant requirement must yield in situations in which exigent circumstances demand that law enforcement agents act without delay. *See United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990). The test to determine whether exigent circumstances exist "is an objective one that turns on . . . the totality of the circumstances confronting law enforcement agents in the particular case." *United States v. Klump*, 536 F.3d 113, 117 (2d Cir. 2008). The "core question" is "whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer to believe that there was an urgent need to render aid or take action." *United States v. Caraballo*, 831 F.3d 95, 102 (2d Cir. 2016) (citation omitted). In deciding whether exigent circumstances existed to justify a warrantless search, courts look to the following non-exhaustive factors: "(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause . . . to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry." *MacDonald*, 916 F.2d at 769-70 (citation and quotation marks omitted). Exigent circumstances, however, do not create an "unfettered license to conduct a generalized search for evidence of criminal activity." *Klump*, 536 F.3d at 118. A search based on exigent circumstances "must be strictly circumscribed by the exigencies which justify its initiation." *Id*. (citation omitted).

Absent exigent circumstances, the Fourth Amendment prohibits law enforcement officers from making a warrantless and nonconsensual entry into a suspect's home to arrest him. *United States v. Allen*, 813 F.3d 76, 78 (2d Cir. 2016). If officers enter a suspect's home without a

warrant to effect an arrest, such an arrest violates the Fourth Amendment; but if the suspect leaves the home and is arrested outside of the threshold of the home, no warrant is required. *See id*. A suspect in an open doorway is exposed to public view and can be arrested without a warrant just as if he were standing completely outside his home. *United States v. Gori*, 230 F.3d 44, 52 (2d Cir. 2000) (citing *Katz v. United States*, 389 U.S. 347, 351 (1967)). When a suspect voluntarily opens the door to his home in response to a knock from a delivery person whom he invited, "[he] created a vista from a public place or common area." *Id*. (citation omitted). If a suspect is arrested outside of the home, the Second Circuit has held that a limited security sweep incident to the arrest is permissible "if the arresting officers had (1) a reasonable belief that third persons [were] inside, and (2) a reasonable belief that the third persons [were] aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of the officers of the public." *United States v. Oguns*, 921 F.2d 442, 446 (2d Cir. 1990) (citation omitted). "Once police eliminate the dangers that justify a security sweep—safety of police, destruction of evidence, escape of criminals—they must, barring other exigencies, leave the residence." *Id*. at 447.

### 2. Application

Defendant argues that law enforcement had no authority to enter the Apartment and that the Government's contention that law enforcement's entry was justified as a protective sweep cannot stand. *See* Def. Mem. in Supp. of Suppression Mot. at 11–12. The protective sweep doctrine allows law enforcement who are legally present in a suspect's home to conduct a visual inspection of surrounding areas "when the officer possesses articulable facts which, taken together with rational inferences from those facts, would warrant a reasonably prudent officer in

believing that the area to be swept harbors an individual posing a danger to those on the . . . scene." *United States v. Miller*, 430 F.3d 93, 98 (2d Cir. 2005) (citation omitted).

In this case, law enforcement engaged in a controlled delivery of what was expected to be a substantial quantity of methamphetamine and did not have an arrest or search warrant, or an anticipatory search or arrest warrant. *See* Def. Mem. in Supp. of Suppression Mot. at 12.

The articulated rationale for entering the Apartment to conduct a protective sweep was that the officers heard noises coming from the bathroom, giving them reason to believe that there was another person in the Apartment. Tr. 9–10.[3] Defendant contends that explanation is not credible, as a video of the Apartment's layout demonstrates that it is not possible to see the bathroom door from the threshold of the Apartment. *See* Def. Mem. in Supp. of Suppression Mot. at 14–15; Ex. B, Dkt 24–2. Consequently, Defendant argues, it is far more likely that the officers had already entered the Apartment and had seen that the bathroom door was closed from the foyer, rendering their entry unlawful. *See id*. at 15. Defendant also argues that even after he exited the bathroom wearing a towel, there were no articulable facts to justify law enforcement's protective sweep. *See id*. at 15–16.

In opposition, the Government argues that entry into the Apartment was justified by exigent circumstances. *See* Gov't Mem. in Opp. to Suppression Mot. at 4–8. The Government contends that the officers' protective sweep was lawful. *See id*. at 5; *United States v. Green*, No. 16-CR-281, 2018 WL 6413485, at *16 (S.D.N.Y. Dec. 6, 2018) (quotation marks omitted) ("[O]fficers may conduct a broader sweep beyond the areas immediately adjoining the place of

---

[3] Notes of a telephone conversation with SA Roskosky, Def. Mem. in Supp. of Suppression Mot., Ex. A, Dkt. 24–1, that were not introduced into evidence but upon which Defendant relied in making his motion to suppress, reflect that the agent said he could see that the bathroom door was closed. Defendant convincingly demonstrated at the Suppression Hearing that the agent could not have seen the door from the hallway outside the Apartment. Tr. 27–28. There was no evidence, however, that contradicted SA Roskosky's testimony that, from the hallway, he could hear noise coming from that area of the Apartment.

9

arrest if there are articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."). SAs Roskosky and DaSilva both testified that the primary concern when planning a controlled drug delivery is safety and that due to the quantity of the methamphetamine in the Package and its corresponding street value, approximately ten agents were involved for "safety reasons." Tr. 9, 40–41. SA Roskosky testified that as a routine safety measure he asked Ramirez if anyone else was inside the apartment; as the agents were arresting Ramirez, SA Roskosky heard sounds coming from the bathroom, which prompted the agents to enter the Apartment to conduct the protective sweep. *Id*. at 9–10.

The protective sweep of the Apartment was lawful. SA Roskosky credibly testified that when Ramirez opened the door to the Apartment and accepted the Package, he was standing in the "threshold of the doorway" and that he was in "the hallway" when he was arrested. *Id*. at 8–9, 43. During SA Roskosky's cross-examination, defense counsel elicited testimony from him that at the time of Ramirez's arrest, Roskosky could not tell whether Ramirez had "one foot inside, [or] one foot outside" the door. *Id*. at 21.

In *United States v. Santana*, 427 U.S. 38, 40 n.1 (1976), the suspect was "standing directly in the doorway one step forward would have put her outside, one step backward would have put her in the vestibule of her residence." The Second Circuit has interpreted that passage in *Santana* as "descriptive, not as the formulation of a rule under the Fourth Amendment," and has cautioned against employing "metaphysical subtleties" to resolve Fourth Amendment challenges. *Gori*, 230 F.3d at 54. Once a door is voluntarily opened by an occupant in response to a knock by someone invited by an occupant—in this case, a presumed FedEx delivery

person—the Fourth Amendment's protection of the home is not violated so long as the officers acted reasonably under the circumstances. *See id*. Like the suspect in *Santana*, 427 U.S. at 40, once Ramirez opened the Apartment door and exposed himself to public view in response to the knock of Officer-1, he abandoned his expectation of privacy. The officers needed no warrant to temporarily "seize" the occupants and to conduct a limited investigation. Such actions are constitutional so long as the limited investigation "was reasonable in all the circumstances." *Gori*, 230 F.3d at 53.

Defendant's contention that exigent circumstances simply do not exist when law enforcement engages in a planned controlled delivery is not supported by precedent. In response to the so-called "police-created exigency," the Supreme Court has held that the "exigent circumstances rule justifies a warrantless search when the conduct of the police preceding the exigency is reasonable in the same sense." *Kentucky v. King*, 563 U.S. 452, 462 (2011). A controlled delivery of drugs by an undercover law enforcement agent "is a recognized and permissible means of investigation" used to gather evidence of illegal conduct and to make lawful arrests. *MacDonald*, 916 F.2d at 771 (citation omitted).

*United States v. Oguns*, 921 F.2d 442 (2d Cir. 1990), involved facts very similar to this case. In *Oguns*, the DEA conducted a controlled delivery of heroin that had been interdicted at the airport. *Id*. at 444. After Oguns accepted the bag that purportedly contained heroin outside of his apartment, he was arrested. *Id*. at 445. The agents saw that the door to his apartment was open; they entered the apartment and conducted a security sweep. *Id*. The Second Circuit upheld the agents' entry because, even in the face of having been told that Oguns' brother was not in the apartment, "they still could have reasonably believed that others were in the apartment." *Id*. at 446. The Circuit reasoned that if anyone was in the apartment, they could

have seen or heard the arrest of Oguns, and that would have posed a risk to the agents. *Id*. at 446–47.

The facts here are more favorable to the Government than the facts of *Oguns*. Through the open Apartment door, the agents heard noises emanating from the bathroom, indicating another individual was, in fact, inside. Thus, as compared to *Oguns* where the agents had no affirmative information that others were inside the apartment, here the agents had clear reason to believe that others were present. The sweep lasted about a minute, and the officers encountered Defendant exiting the bathroom. Tr. 33. Because the officers had "a reasonable belief that [another individual was] inside" the Apartment and a reasonable belief that the individual in the apartment could have heard or become aware of the arrest outside the premises, the officers acted reasonably when they entered the Apartment to conduct a protective sweep. *See Oguns*, 921 F.2d at 446. Because the agents acted reasonably, their entry into the Apartment was lawful.

### B. Defendant Consented to a Search of the Apartment

#### 1. Legal Standard

The Fourth Amendment ordinarily requires the Government to obtain a search warrant before searching a residence. *See Johnson v. United States*, 333 U.S. 10, 14 (1948); *United States v. Clark*, 638 F.3d 89, 93–95 (2d Cir. 2011). The warrant requirement is, however, subject to numerous exceptions. *See Kentucky*, 563 U.S. at 459. Among the exceptions is consent. *See United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018). "Consent can be found from an individual's words, acts[,] or conduct." *Krause v. Penny*, 837 F.2d 595, 597 (2d Cir. 1988). "[T]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness -- what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *United States v. O'Brien*, 926 F.3d 57, 76–77 (2d Cir. 2019). The Supreme Court has explained that "the question whether a consent to

a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227 (1973). The Government bears the burden to prove that consent was "a product of that individual's free and unconstrained choice, . . . rather than a mere acquiescence in a show of authority." *See Iverson*, 897 F.3d at 458.

### 2. Application

Defendant raises two arguments regarding consent: first, he argues that his response to law enforcement that he had a firearm in his dresser drawer when asked if there was anything the officers should know about did not constitute consent to law enforcement opening the drawer. *See* Def. Mem. in Supp. of Suppression Mot. at 16–18. Second, Defendant argues that his written consent to search the apartment was not given voluntarily. *See id*. at 23-24.

Defendant primarily contends that his "merely identifying the presence of a firearm does not equate to express consent to search a private area for that gun." *Id*. at 17. The totality of the circumstances, he alleges, does not support a finding that his response was explicit or implicit consent: Defendant had exited the bathroom wearing only a towel to find several officers in his living room, and there was only a short lapse of time between being confronted by law enforcement and telling the officers about the firearm. *See id*. Defendant also notes that officers did not apprise him of the purpose of their presence or that he could refuse to consent. *See id*. at 18.

Defendant also asserts that his written consent to search was not voluntarily given and, as such, the cellphone that was seized in the bathroom must be suppressed. *See id*. at 23–24. Looking to *United States v. Isiofia*, 370 F.3d 226 (2d Cir. 2004), in which the Second Circuit affirmed the district court's finding that a suspect's consent was not voluntary, Defendant argues

13

that he faced coercive pressures from the officers similar to those at issue in *Isiofia*. *See* Def. Mem. in Supp. of Suppression Mot. at 23–24. Defendant also argues that the search warrant affidavit submitted to obtain a warrant to search the contents of his cellphone was predicated on information gained from the illegal entry; he argues that if such evidence is excised from the warrant application, the warrant lacks probable cause. *See id*. at 24–26.

In opposition, the Government argues that Defendant has not adduced any facts, by affidavit or otherwise, to suggest that his written consent was not voluntarily given. *See* Gov't Mem. in Opp. to Suppression Mot. at 10–11. The Government notes that in *Isiofia*, on which Defendant relies exclusively, the defendant submitted a detailed affidavit noting that he had been drinking heavily the morning of the search. Defendant has not proffered any similar evidence detailing facts that might tend to undercut the voluntariness of his consent. *See id*. at 11 n.3 (citing *Isiofia*, No. 2-CR-520, 2003 WL 21018853, at *3 n.12 (S.D.N.Y. May 5, 2003)).

At the hearing, Detective Martin testified that, because safety for the law enforcement officers was the foremost concern, when he entered Defendant's bedroom, he "asked [Defendant] if there w[ere] any weapons or contraband in the room that could harm or hurt [them]." Tr. 61. Defendant told the officers, "[they] could look around the dresser where he pointed to." *Id*. at 61–62. The evidence does not support Defendant's assertion that his consent to search the dresser was not voluntarily given. Defendant volunteered consent before being asked for permission to search. *See United States v. Simmons*, 861 F. Supp. 2d 307, 311 (S.D.N.Y. 2012) (citation omitted), *aff'd*, 543 F. App'x 101 (2d Cir. 2013) ("[A] defendant's directions to a firearm amounts to, or may be found to amount to, implied consent, at least for the limited purpose of retrieving the gun."); *United States v. Sharma*, No. 18-CR-340, 2019 WL 3802223, at *8 (S.D.N.Y. Aug. 13, 2019) (holding that the defendant's statements were

voluntary where he told law enforcement he wanted to cooperate and volunteered that his firearm was on his nightstand); *United States v. Wilson*, 914 F. Supp. 2d 550, 567 (S.D.N.Y. 2012) (holding that the defendant's "own explanation of his motivations for directing the officers to the location of the guns constitutes implied consent"); *United States v. Candella*, 469 F.2d 173, 175 (2d Cir. 1972) (holding that defendant's "statement that the guns were in the container was the equivalent of his opening the containers for the agents' inspection" and that "once the [defendant] told the agents where the guns were, they were no longer 'concealed' and it was reasonable for the agents to seize them"). In short, because Defendant consented to the search of his dresser, Defendant's motion to suppress the firearm and ammunition is denied.

The subsequent seizure of Defendant's cellphone was also lawful. Defendant consented in writing to the search of the Apartment, and there is no basis to conclude that his consent was the product of duress or coercion. Defendant contends that his consent was involuntary because he was not informed that he could refuse. Def. Mem. in Supp. of Suppression Mot. at 18. Detective Martin testified credibly, however, that Defendant was told that he could object to the search. Tr. 63–64. But even if Defendant was not informed of his right to refuse to consent, that would not change the analysis. *See O'Brien*, 926 F.3d at 77 ("Fourth Amendment standards do not make it mandatory to advise a suspect of his right to refuse consent to search."). When asked about the atmosphere in the room when Defendant signed both the consent form and the *Miranda* waiver, Detective Martin described it as "amicable, friendly" and that Defendant was "cool and relaxed." Tr. 65–66. Additionally, the Government introduced excerpts of Defendant's post-arrest interview, in which he stated that he told the officers as soon as they came into his bedroom about the firearm. Gov't Ex. 6 at 9:50–10:05. In short, the evidence adduced at the suppression hearing supports the Government's position that Defendant consented

to the search, and it lends no support for Defendant's assertion that the circumstances of the search were fundamentally "coercive." See Def. Mem. in Supp. of Suppression Mot. at 23–24.

Defendant's attempt to analogize his case to *Isiofia* is unpersuasive. See id.; *O'Brien*, 926 F.3d at 77. In *Isiofia*, the district court found a defendant's consent to search his apartment, computer, and car, following an unlawful entry, was not voluntary; eight officers remained in the living room with the defendant for over an hour without a good reason to remain; the agents did not tell the defendant with what crime he was being charged; the defendant was not fluent in English; and the defendant was given forms that did not describe the objects to be seized. See 370 F.3d at 231. Here, Defendant claims he was detained in a similarly "startling" manner after coming out of the bathroom and discovering multiple armed agents in his Apartment. See Def. Mem. in Supp. of Suppression Mot. at 23.

Although the Court does not doubt that the circumstances were startling, the similarities between the search of Defendant's Apartment and the situation in *Isiofia* end with the fact that multiple officers entered their respective homes. Unlike in *Isiofia*, there was no illegal entry into Defendant's apartment; the officers were conducting a legal protective sweep after arresting Ramirez. See supra. The record indicates that the time that had elapsed between when the officers confronted Defendant outside the bathroom and when he consented to a search of the Apartment was short (roughly seven and half minutes), far less than the hour and fifteen minutes that elapsed after the officer's illegal entry in *Isiofia*. Tr. 38, 63. See also 2003 WL 21018853, at *8. Detective Martin testified that he told Defendant that the officers were in the Apartment for a "meth investigation" and that they had attempted to "deliver meth that day" to his apartment. Tr. 76. Defendant has not put forward any other facts from which the Court might

find that his consent was not given voluntarily.  The discovery and seizure of Defendant's cellphone from the bathroom during the search was, therefore, legal.

Because Defendant consented to the searches that led to the seizure of the firearm, ammunition, and cellphone, his motion to suppress that evidence must be denied.

### C. The Evidence Obtained from Ramirez is Not Fruit of the Poisonous Tree

#### 1. Legal Standard

The fruit of the poisonous tree doctrine requires the exclusion of the fruits of illegally obtained evidence unless the evidence at issue has been obtained "by means sufficiently distinguishable to be purged of the primary taint." *See United States v. Ghailani*, 743 F. Supp. 2d 242, 250 (S.D.N.Y. 2020) (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). Courts developed the fruit of the poisonous tree doctrine as an "exclusionary rule [that] operates as a judicially created remedy designed to safeguard against future violations of Fourth Amendment rights through the rule's general deterrent effect." *United States v. Awadallah*, 349 F.3d 42, 72 (2d Cir. 2003) (citation omitted).  Fourth Amendment rights are, however, "personal rights . . . [that] may not be vicariously asserted." *United States v. Tranquillo*, 606 F. Supp. 2d 370, 376 (S.D.N.Y. 2009).  The defendant bears the burden of proving that his personal rights were violated by the challenged search or seizure.  *See id*. at 377.

#### 2. Application

Defendant moves to suppress the evidence obtained from Ramirez.  *See* Def. Mem. in Supp. of Suppression Mot. at 19–21.  Recognizing that a defendant has standing to suppress evidence that constitutes the poisonous tree, Defendant cites *United States v. Olivares-Rangel*, 458 F.3d 1104, 1117 (10th Cir. 2006), for the proposition that "the law imposes no separate standing requirement regarding the *evidence* which constitutes the fruit of that poisonous tree."

Def. Mem. in Supp. of Suppression Mot. at 20. Defendant contends that but for law enforcement's "illegal entry" into the Apartment, the Government would not have obtained Ramirez's post-arrest statement or his consent to search his cellphone. *See id.* at 21; *Wong Sun*, 371 U.S. at 487–88 ("[V]erbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion.").

The Government questions Defendant's standing to suppress the evidence obtained from Ramirez and, alternatively, asserts that it is not the fruit of the poisonous tree because there was no unlawful action. *See* Gov't Mem. in Opp. to Suppression Mot. at 11–12.

The evidence obtained from Ramirez is not fruit of the poisonous tree, as the Court has already held that law enforcement's entry into the Apartment was a lawful protective sweep following Ramirez's lawful arrest. Additionally, even if law enforcement's entry into the Apartment were unlawful, Defendant cannot suppress Ramirez's post-arrest statements because Fourth Amendment rights "are personal rights which, . . . may not be vicariously asserted;" nor can he suppress the evidence from Ramirez's cellphone, as Defendant does not own and has no possessory interest in Ramirez's cellphone. *See United States v. Perez*, No. 19-CR-304, 2020 WL 5542677, at *3 (D. Conn. Sep. 16, 2020) (citing *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978)).

For all those reasons, Defendant's motion to suppress is denied.

## CONCLUSION

For the foregoing reasons, Defendant's motions to dismiss Count Two of the Superseding Indictment and to suppress evidence are DENIED.

The Clerk of Court is respectfully directed to close the open motions at docket entries 23 and 25.

**SO ORDERED.**

Date:  December 20, 2023
       New York, NY

**VALERIE CAPRONI**
**United States District Judge**