# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

May 15, 2024

**BY ECF**

The Honorable Valerie E. Caproni
Southern District of New York
United States Courthouse
40 Foley Square, Rm. 240
New York, New York 10007

Re:   **United States v. Mateo Cabrera**
      **23-CR-0209 (VEC) – SENTENCING MEMORANDUM**

Dear Judge Caproni:

      Mateo Cabrera was taught to sell drugs by his father beginning at the age of fifteen. Since then, he has struggled to shed completely that behavior which was ingrained in him during his formative years. Unfortunately, this constant battle has landed him in a position where he now faces significant time in prison.

      Despite what his RAP sheet may reflect, Mr. Cabrera is much more than his criminal history. He is a dedicated father of two beautiful children, one who is currently enrolled in college and the other who will begin college in the fall. He is a supportive brother to three sisters, one of which is a single mother of two boys who Mr. Cabrera helped raise. And he is a loyal friend -- the type who will open his home to anyone in need. As those who love him would say, Mr. Cabrera is one of the most kind-hearted people that they know. And it breaks their heart to see him in this position once again.

      Mr. Cabrera knows he made a series of poor decisions, and that those poor decisions have consequences he must face. But for the reasons set forth below, including his deteriorating health, Mr. Cabrera respectfully asks the Court to extend its grace and impose a sentence of no greater than 90 months in prison.

      **I.**    **Mr. Cabrera's Behavior was Learned at Home**

      Mr. Cabrera is a 51-year-old man who was born in Paterson, New Jersey to the union of Mateo Enrique Cabrera and Anita Caraballo. PSR ¶ 49. He has one fully biological sister and two paternal half-sisters, who all reside in the New York City area. *Id.* Due to his family moving around frequently, Mr. Cabrera's childhood lacked stability. Indeed, growing up, he moved seven different times throughout the Northeast and the Southern United States. *Id.* While he performed well in school and excelled in sports, the constant turnover undoubtedly affected his ability to form

1

positive relationships, thereby exposing him to the dark side of his neighborhood. To that end, Mr. Cabrera maintains that "everything" started "to go wrong" when he moved back to New York City as an adolescent. *Id.* ¶ 51.

Mr. Cabrera and his family lived in Upper Manhattan, which he describes as a neighborhood known for being a hotspot for illicit drug activity. As an example, Mr. Cabrera recalls at the age of twelve being asked by one of his friends whether he knew where to score drugs for a relative. *Id.* Mr. Cabrera introduced this individual to someone in his neighborhood, and he earned $2,300 simply by making the connection. *Id.* This was more money than Mr. Cabrera had ever seen at one time, and the allure of making quick cash planted a seed that was later watered by his own father.

As suggested above, Mr. Cabrera's neighborhood was not the only negative influence in his life. To the contrary, his actions in this case stem directly from behavior that he learned at home. Although Mr. Cabrera respected and adored his late father, his father had him selling drugs starting at the age of fifteen. It is thus no coincidence that Mr. Cabrera's first drug-related arrest in 1998 came one year after his father was convicted for drug trafficking and sentenced to eight years in state prison. *Id.* at 52. Make no mistake, Mr. Cabrera's actions in this case are a product of the environment in which he was raised.

Despite his shortcomings, one thing Mr. Cabrera has excelled at is being a committed father, friend, and brother. Mr. Cabrera has two children, ages seventeen and nineteen. His son is a student at the University of Albany, and his daughter will graduate from high school on May 31, 2024 and attend college in Massachusetts in the fall. PSR at ¶¶ 55, 62. They are Mr. Cabrera's pride and joy.



**(Pictured Above: Mateo Cabrera with his Children)**

Mr. Cabrera has also served as a father figure to several other young people in his life. His sister,

Jacquelin Cabrera, for instance, expressed that Mr. Cabrera helped raise her two sons, who are now thirty-four and thirty-one. *Id.* ¶ 62. Esmeily Ramirez, a family friend of Mr. Cabrera, wrote a letter expressing how Mr. Cabrera would drive her to school and camp, and would always be there for her and her siblings. *See* Exhibit 1 (Esmeily Ramirez Letter). And Luis Avila, a twenty-five-year-old medical student whose family has known Mr. Cabrera for decades, wrote a letter expressing how Mr. Cabrera welcomed him into his home when he did not have a place to live:

> The story that I am about to share is one that hits home. This basically means that it always makes me emotional. This happened around October or September of last year. I had a busy schedule and I was running low on money. I had $7 to my name. I started doing Uber eats while attending grad school full time. I was barely sleeping because I had to make time to study, Uber eats and attend my classes. I am the type of person that does not like to share or express what I am going through to people. I would rather drown than to ask for help. I will be honest, I had the support of my parents but they had problems of their own so I did not want to add extra weight. It got to the point where I was sleeping in my school's parking lot. Sometimes I would sleep at the parking lot from La Fitness, the one that is located in Ridge Hill. One night, I called Mateo to check up on him. He asked me how I was feeling and I said I was feeling great but he knew me. He knew me better than I knew myself. He told me to tell him what was going on, he knew I was not doing good, he knew something was not right. I told him my situation and he immediately offered me his home. He said as long as he is breathing, I do not have to struggle. This made me very emotional because my own sister who is like my best friend did not even offer me her home, not even a couch so I can lay my head at. He gave me a home and food.



**(Pictured Above: Mateo Cabrera with Luis Avila and his Mother)**

3

*See* Exhibit 1 (Luis Avila Letter).  Mr. Cabrera's selflessness is well represented all throughout the letters of support submitted on his behalf.  Regardless of his missteps, he is beloved by each of these individuals, and they all remain supportive.



**(Pictured Above: Mateo Cabrera with Family)**

This case has weighed heavily on Mr. Cabrera's heart.  And this is no hyperbolic statement.  Mr. Cabrera suffers from a myriad of physical health ailments, including diabetes, high blood pressure, and severe kidney and liver issues.  PSR ¶ 67; *see* Exhibit 2 (Hospital Treatment List); Exhibit 3 (September 2022 Hospitalization Records); Exhibit 4 (March 2024 Hospital Discharge Records).  Due to the stress of everything crashing down on him, he had to be rushed to the hospital on March 3, 2024 after suffering prolonged chest pain, and again on March 21, 2024 for continuing chest pain.  PSR ¶ 69; *see* Exhibit 5 (March 2024 Hospitalization Records).  Records from Bronx Lebanon Hospital show that this was not the first time Mr. Cabrera has been hospitalized for concerns about his chest and heart.  In April 2020, Mr. Cabrera was admitted to Bronx Lebanon Hospital after experiencing sudden chest pains while he was driving, describing the sensation as "like an eagle is squeezing it with its claw."  *See* Exhibit 6 (April 2020 Hospitalization Records).  Treatments notes reflect that the treating physician found blood clots and signs of double vessel disease, and Mr. Cabrera was treated for a heart attack (i.e., Acute ST Elevation Myocardial Infarction of Inferior Wall).[1]  *Id.*  He was again admitted to the hospital for chest pain in December 2021.  *See* Exhibit 7 (December 2021 Hospitalization Treatment Records).  While Mr. Cabrera knows that he must serve time in prison, he asks the Court to take his deteriorating health into account when fashioning an appropriate sentence.  He is fearful for his life, as his own father passed away from diabetes and kidney failure, conditions that he too is battling.  Hence, the longer Mr. Cabrera remains behind bars, the more vulnerable he is to similar health complications.

---

[1] https://my.clevelandclinic.org/health/diseases/22068-stemi-heart-attack ("An ST-elevation myocardial infarction (STEMI) is a type of heart attack that mainly affects your heart's lower chambers.  They are named for how they change the appearance of your heart's electrical activity on a certain type of diagnostic test.  STEMIs tend to be more severe and dangerous compared to other types of heart attack.")

## II. Mr. Cabrera's Financial Struggles During the COVID-19 Pandemic Led to Poor Decisions.

The Court is undoubtedly familiar with the offense conduct in this case from the Presentence Report. What may not be apparent, however, is why Mr. Cabrera did what he did with respect to the drug offense. As Mr. Cabrera discusses in his letter to the Court, he was doing extremely well following his release from prison in 2018, but the economic downturn caused by the COVID-19 pandemic, left him reeling for a way to support himself financially:

> Your Honor as I stated before, upon my release from New York State prison in April of 2018, I immediately hit the ground running. Looking for work in any field I thought would hire me. Since I worked as a painter for two years while incarcerated, I figured why not continue to do that. So I looked everywhere for work as a painter. For months I filled out applications and made calls, but nothing. Lucky for me I went out to the supermarket in Dyckman and there I saw an old friend. After a few moments of talking, I told him that I was looking for work and he said he could help me. We exchanged numbers, and I used that number immediately. I called him the next day and he gave me all the info for Baldor Express Foods. They are a food distribution company in the Bronx. I went there and they gave me employment mainly because I knew Victor which is the company's head chef. But your Honor they hired me, I was so proud, so happy. They (sic) pay was minimal and the hours were long, but I had a job and I loved it. I got hired as a helper and within 4 months I was a driver, and within two months after that I had my own route, and within less than a year on the route they promoted me to training the New Drivers Brooklyn routes. Point is your Honor is that I got given a chance and I ran with it, I never looked back. I got my own car, fixed up my apartment, got my credit right, and I was ALWAYS in my kids' lives. I just was doing good.



**(Pictured Above: Mateo Cabrera in his Work Truck)**

> Then COVID-19 hit, and it hit Baldor bad. Since Baldor's main customers were hotels, restaurants and things of that nature and since COVID shut down the world, nobody could go out and it made Baldor lay off 300 plus drivers and I was one of them. Your Honor I could not find work after that or since. I survived on unemployment until that stopped but things got hard your Honor. I know that that is not an excuse for breaking that promise to myself and breaking the law again but your Honor I was desperate. I had already lost everything I mentioned. The only reason I didn't lose my home was because I took on roommates to help with the rent. I got offered the opportunity to make a couple dollars to receive packages in my home and out of pure desperation I excepted (sic). I thought at that moment that I was helping myself out of a financial bind, little did I know that I was expecting my own demise.

*See* Exhibit 1 (Mateo Cabrera Letter).  Certainly, there is no excuse for engaging in drug trafficking, or any other crime, but the above context is important when fashioning an appropriate sentence.

To his credit, Mr. Cabrera has learned his lesson that chasing quick money does not pay off in the long run.  That is why he has put so much effort into pursuing legitimate work while on pretrial release.  As noted in the PSR, he obtained a warehouse position at an Amazon Fulfillment Center in the fall of last year, but because he did not receive approval from his pretrial services officer to attend the required onboarding and training, that position fell through.  PSR at ¶ 85.  Although his efforts fell short, Mr. Cabrera remains adamant that he will not place himself in this position again.  Upon release, his goals are to obtain his CDL License, so he can drive buses, and to be active in his children's lives.  Mr. Cabrera's children are his core, and it destroys him that he, like his own father, will be away from them for so long.

### III. The Court has Wide Discretion to Impose a Below Guidelines Sentence.

"A sentencing judge has very wide latitude to decide the proper degree of punishment of an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008).  In exercising its discretion, courts must be "mindful of the fact that the Sentencing Guidelines are just that, guidelines, and that they are truly advisory." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013) (internal quotations and citation omitted).  Moreover, the Second Circuit has "declined to adopt a presumption of reasonableness for sentences that fall within the guidelines range." *Id.* (citation omitted).  Instead, the Second Circuit has championed "a more flexible approach that allows considerations of the facts of an individual case." *Id.*  Ultimately, courts are to use as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a), which directs sentencing courts to impose a sentence sufficient, but not greater than necessary to comply with the factors set out in 18 U.S.C. § 3553(a)(2)" – proportionality, deterrence, incapacitation, and rehabilitation.  *Id.* (internal quotations and citation omitted).  Stated differently, the Court must "consider every convicted person as an individual" and its sentence must "fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011).

### IV. The § 3553(a) Factors Support a Sentence of 90 Months.

In recommending a downward variance to 180 months from the presumptive Guidelines range of 292 to 365 months, probation clearly recognizes Mr. Cabrera's significant mitigating factors, including his health, the lack of violence associated with this crime, the fact that he did not play a managerial role, his decision to be forthcoming about his involvement in this offense, and the familial support he will have upon his release. Probation's downward variance, however, does not go far enough. While it is true that Mr. Cabrera has an extensive criminal history, the longest sentence he has ever received to date has been six years; and that was back in 2006 for a crime involving violence. Probation's recommended sentence of fifteen years for the non-violent offenses in this case would thus be nearly three times the length of any sentence Mr. Cabrera has previously served. Furthermore, probation's recommended sentence would be 200% longer than the sentence Mr. Cabrera received in the Southern District of New York back in 1999 for similar drug trafficking conduct. Probation's recommended sentence is disproportionate to the crime committed and would therefore be far greater than necessary to achieve the purposes set forth in § 3553(a).

Instead, the Court should sentence Mr. Cabrera to a prison term of 90 months. As a threshold matter, this would constitute a progressive sentence, as it would be longer than any that he has previously served, regardless of offense type. More importantly, this requested sentence would be 50% longer than the sentence Mr. Cabrera previously received in this District back in 1999 for similar drug trafficking conduct. Accordingly, a sentence of 90 months would both sufficiently punish Mr. Cabrera proportionate to his prior federal drug offense and deter him by signaling that his exposure will continue to increase if he were to commit a similar offense again in the future.

A significant downward variance is also warranted when considering Mr. Cabrera's upbringing and his forced exposure to the drug trade during his formative years. It is one thing for a child to grow up in a neighborhood surrounded by negative influences, but it is another for that child to be groomed for a life of crime by his own father. That was Mr. Cabrera's childhood. Beginning at just the age of fifteen, Mr. Cabrera's father had him assisting with drug sales. Eventually, Mr. Cabrera's father got caught, convicted, and deported. And Mr. Cabrera followed down that same path. Yes, Mr. Cabrera is now an adult in his fifties. And yes, he is responsible for his own decisions. This, however, does not change the fact that his behavior was taught by someone with great influence over his life.

Finally, a sentence of 90 months is warranted in light of Mr. Cabrera's deteriorating health and his need for regular follow-up care. Over the past four years, he has been hospitalized at least five times due to issues with his heart, kidney, and liver. Indeed, he has been diagnosed with a myriad of illnesses, including diabetes, coronary artery disease, and chronic kidney disease. Most recently, in March 2024, he was hospitalized on two occasions for symptoms that present concerns about both the short and long-term health of his heart. While in an ideal world, Mr. Cabrera would receive the medical care that he needs while in prison, the reality is that prisoner needs are regularly neglected. To that point, the Court needs to look no further than our local federal prison, MDC Brooklyn, where ignored medical orders are as predictable as the sun rising each morning. Mr. Cabrera understands that prison is unavoidable given the five-year mandatory minimum sentence

he faces. But he asks the Court to consider his need for continuing health care when fashioning an appropriate sentence above that mandatory minimum.

### V.     Conclusion

There is nothing minimal about a sentence of 90 months. It would be the longest sentence that Mr. Cabrera has ever served, and it would be 50% longer than the previous drug trafficking sentence he received in this District back in 1999. In short, such a sentence would sufficiently punish Mr. Cabrera for his conduct while appropriately balancing the need to hasten his access to long-term health care. Accordingly, for all of the reasons stated herein, Mr. Cabrera respectfully asks the Court to impose a sentence of no greater than 90 months. He also asks the Court to allow him the opportunity to self-surrender, at least until after May 31, 2024, so that he can watch his daughter graduate from high school.

Respectfully Submitted,
/s/
Kristoff I. Williams
Assistant Federal Defender
Federal Defenders of New York
(212) 417-8791